**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HAROLD B. VAILES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-3400 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Harold B. Vailes' ("Vailes") and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration ("the Commissioner"), response to Vailes' motion for summary judgment. Vailes appeals the determination of an Administrative Law Judge ("ALJ") that he is not entitled to receive Title II disability insurance benefits. *See* 42 U.S.C. §§ 416(i), 423. Having reviewed the pending motion, the submissions of the parties, the pleadings, the administrative record, and the applicable law, it is ordered that Vailes' Motion for Summary Judgment (Docket Entry No. 14) is denied, and the Commissioner's decision denying benefits is affirmed.

**I.      *Background***

Vailes filed an application for disability insurance benefits with the Social Security Administration ("SSA") on September 21, 2004, claiming that he was disabled from October 19, 2003, to March 28, 2005. (R. 50-55). Vailes alleged that he suffers from several disabling

conditions, including coronary artery disease,[1] diabetes mellitus,[2] obesity,[3] essential hypertension,[4] and back, chest, and jaw pain.  (R. 47, 95, 97).   After being denied benefits initially and on reconsideration, Vailes requested a hearing before an ALJ.  (R. 19, 20, 32).  On January 19, 2006, Vailes amended his application to request disability benefits only for the closed period of October 19, 2003, through March 28, 2005.  (R. 47-48).  Additionally, through counsel, Vailes also requested that a decision be made based on the record without a hearing.  (R. 47-48).

In a decision dated March 28, 2006, the ALJ denied Vailes' application for benefits.  (R. 12-18).  On June 1, 2006, Vailes appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals.  (R. 8).  On August 25, 2006, the Appeals Council denied Vailes' request to review the ALJ's determination.  (R. 5-8).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Vailes subsequently brought this action, seeking judicial review of the Commissioner's denial of his claim for benefits. *See* Docket Entry No. 1.

---

[1]  "Coronary" is a term that usually denotes the arteries that supply the heart muscle. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 405 (29th ed. 2000).  Therefore, "coronary artery disease" is a disease of the arteries that supply the heart muscle.

[2]  "Diabetes mellitus" is a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance. Type 2 is usually onset between 50 and 60 years of age. There is no need for insulin injections, and dietary control is usually effective. Obesity and genetic factors may also be present. *See* DORLAND'S, *supra*, at 489-490.

[3] "Obesity" is an increase in body weight beyond the limitation of skeletal and physical requirement, as the result of an excessive accumulation of fat in the body.  *See* DORLAND'S, *supra*, at 1251.

[4]  "Essential hypertension" is high arterial blood pressure that occurs without discoverable organic cause. *See* DORLAND'S, *supra*, at 858.

## II.   *Analysis*

### A.   *Statutory Basis for Benefits*

Social security disability insurance benefits are authorized by Title II of the Act and are funded by social security taxes.  *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100.  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Vailes was insured through the date of the ALJ's decision—March 28, 2006.  (R. 12-18).  Consequently, to be eligible for disability benefits, Vailes must prove that he was disabled for some period prior to that date.

Applicants seeking benefits under Title II must prove "disability" within the meaning of the Act, which defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a)

### B.   *Standard of Review*

#### 1.   *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the

nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion the burden shifts to the nonmoving party, who must present specific and supported material facts of significant probative value to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.      *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and

less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present."  *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, re-weigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve."  *Id*.

**C.**      ***ALJ's Determination***

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is, in fact, disabled:

1.      An individual who is working and engaging in "substantial gainful activity" will not be found disabled regardless of the medical findings.  *See* 20 C.F.R. § 404.1520(b).

2.      An individual who does not have a "severe impairment" will not be found to be disabled.  *See* 20 C.F.R. § 404.1520(c).

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. § 404.1520(d).

4.      An individual who is capable of performing the work he has done in the past will not be found to be disabled.  *See* 20 C.F.R. § 404.1520(f).

5.    If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd v. Apfel*, 239 F.3d 698, 704-05 (5th Cir. 2001). The claimant has the burden to prove disability under the first four steps. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001). If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his existing impairments, the burden shifts back to the claimant to prove that he cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id*.

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that he suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if he applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(1) of the Social Security Act and is insured for benefits at least through the date of this decision.

2.    Work performed in 2003 and 2004 constitutes an unsuccessful work attempt. The claimant has engaged in substantial gainful activity since March 28, 2005.

3.      The claimant has obesity, coronary artery disease, hypertension, and diabetes mellitus, which are considered "severe" based on the requirements in Regulations 20 C.F.R. § 404.1520(c).

4.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The claimant's allegations regarding his limitations are not totally credible.

6.      From the alleged onset date of October 19, 2003, to March 28, 2005, the claimant had the residual functional capacity to perform medium work.

7.      From the alleged onset date of October 19, 2003, to March 28, 2005, the claimant retained the residual functional capacity to perform his past relevant work as an assistant jail administrator and book desk supervisor (20 C.F.R. § 404.1565).

(R. 17-18).  Since finding that a claimant has the ability to perform past relevant work results in a conclusive finding that no disability exists, the ALJ's analysis was terminated and he did not continue on the fifth step of the inquiry.  The ALJ simply concluded with his last finding:

8.      The claimant was not under a "disability" as defined in the Social Security Act, at any time relevant to this decision (20 C.F.R. § 404.1520(f)).

(R. 18).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g).  To determine whether the decision to deny Vailes' claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and

work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ, and not the Court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

### D.     *Issues Presented*

Vailes argues that the decision of the ALJ is not supported by substantial evidence. Specifically, Vailes contends that:  (1) the ALJ erred in finding that the plaintiff could perform medium work; and (2) the ALJ erred in failing to obtain expert medical opinion to either refute or corroborate the medical opinions of Vailes' physicians.  *See* Docket Entry No. 14, at 2-5.  The Commissioner disagrees with Vailes' contentions, maintaining that the ALJ's decision is supported by substantial evidence.  *See* Docket Entry No. 16.

### E.     *Review of the ALJ's Decision*

#### 1.     *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually working and his impairments match or are equivalent to one of the listed impairments, he is presumed to be disabled and qualifies for benefits without further inquiry.  *See id.* at 532; *see also* 20 C.F.R. § 416.920(d).  When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C.

§ 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairments most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that his impairment or combination of impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that his disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id*.  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical

10

findings are at least equal in severity and duration to the listed findings.  *See* 20 C.F.R. § 404.1526(a).  The applicable regulations further provide:

> (1)(i)  If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
>> (A)  You do not exhibit one or more of the medical findings specified in the particular listing, or
>>
>> (B)  You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)  We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. § 404.1527(e).

A review of the medical records submitted in connection with the ALJ's decision reveals that Vailes' active problems are coronary artery disease, hyperlipidemia,[5] diabetes, and hypertension. (R. 171).  In determining Vailes' RFC, the ALJ found that Vailes had severe impairments of obesity, coronary artery disease, hypertension, and diabetes mellitus.  (R. 17).  The ALJ, however, found that these impairments did not meet or equal the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17).

---

[5] "Hyperlipidemia" is a general term for elevated concentrations of any or all of the lipids in the plasma.  *See* DORLAND'S, *supra*, at 852.

On May 14, 2001, Brenda K. Peabody, M.D., F.A.C.C. ("Dr. Peabody"), a cardiologist at North Houston Heart Center, ordered that Vailes receive an Exercise Tolerance Test before his initial appointment with her. (R. 128). His total exercise time was 7 minutes and 22 seconds, which resulted in Dr. Peabody noting that Vailes' functional aerobic capacity and physical response was fair to good. (R. 128). The next day, on May 15, 2001, Vailes met with Bruce S. Lachterman, M.D. ("Dr. Lachterman"), also a physician at North Houston Heart Center, who performed an x-ray on Vailes' chest. Dr. Lachterman concluded that the x-ray was completely normal. (R. 119).

On May 16, 2001, Vailes had his first appointment with Dr. Peabody, during which he complained of chest and jaw pain. (R. 109). At this time, Vailes told Dr. Peabody that his symptoms had been occurring for about one month. (R. 109). Dr. Peabody referred the claimant for a left heart catheterization[6] and an angiography,[7] which Dr. Lachterman performed the same day. (R. 110, 112-114). Dr. Lachterman concluded that Vailes had coronary disease and high grade stenosis[8] of the left circumflex. (R. 114). Dr. Lachterman also noted that there was preserved left

---

[6] A "heart catheterization" is also called a "cardiac catheterization" which is a procedure where a small catheter is passed into the heart, permitting the securing of blood samples, determination of intracardiac pressure, detection of cardiac anomalies, planning of operative approaches, and determination, implementation or evaluation of appropriate therapy. *See* DORLAND'S, *supra*, at 300.

[7] An "angiography" is the radiographic visualization of blood vessels following introduction of contrast material. It is used as a diagnostic aid in certain conditions. *See* DORLAND'S, *supra*, at 83.

[8] "Stenosis" is the abnormal narrowing of a duct or canal. *See* DORLAND'S, *supra*, at 1698.

12

ventricular systolic function,[9] and there was a successful angioplasty and stenting[10] of the left circumflex.  (R. 114).

On May 22, 2001, Vailes had a follow-up appointment with Dr. Peabody to discuss the heart catheterization.  (R. 126).  Dr. Peabody noted that Vailes stated he had continued to have some mild discomfort in his chest after the catheterization, but that he was feeling quite good on the day of the visit.  (R. 126).

Vailes had another follow-up appointment with Dr. Peabody on June 5, 2001, during which he stated that he was doing fairly well, but was experiencing chest and jaw discomfort after walking.  (R. 124).  At the appointment, Dr. Peabody told Vailes that they would have to repeat the exercise test.  (R. 125).  On June 7, 2001, another exercise test was performed, and Vailes was able to exercise for a total of 7 minutes and 3 seconds.  (R. 117).  Dr. Peabody noted that there was likely a small area of inferior wall ischemia.[11]  (R. 117).

Dr. Lachterman performed a second heart catheterization and a selective coronary angiography on June 13, 2001.  (R. 115-116).  After the procedure, Dr. Lachterman noted that there

---

[9]  "Systolic" pertains to the systole. The "systole" is the contraction, or period of contraction, of the heart, especially that of the ventricles. Therefore, the claimant had a normal period of heart contractions.  *See* DORLAND'S, *supra*, at 1781.

[10] A "stent" is a slender rod-like or threadlike device used to provide support for tubular structures that are being anastomosed, or to introduce or maintain their patency.  *See* DORLAND'S, *supra*, at 1698.

[11] "Ischemia" is the deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel.  *See* DORLAND'S, *supra*, at 920.

was mild coronary atherosclerosis,[12] persistent patency[13] of the left circumflex - previously stented, and normal left ventricular function.  (R. 116).

On June 19, 2001, Vailes had a follow-up appointment with Dr. Peabody to discuss the second heart catheterization.  (R.123).  Dr. Peabody noted that Vailes' arteries appeared to be in good order, and that there was no problem with the site of the stent.  (R. 123).  One month later, on July 21, 2001, Vailes told Dr. Peabody that he had a great deal of energy.  (R. 122).  It was also noted that Vailes had been doing an excellent job regarding his health.  (R. 122).

There is no record evidence indicating any additional doctor visits between August and December, 2001.  On January 17, 2002, Vailes had a follow-up visit with Dr. Peabody.  (R. 120).  At this appointment it was noted that Vailes' height was 6'0" and that he weighed 256 pounds.  (R. 120).  It was reported that his weight was down 27 pounds from the previous year, at which time he had weighed 283 pounds.  (R. 110).  During the examination, Dr. Peabody noted that Vailes appeared well and that everything in his neck, lungs, and cardiovascular system appeared to be in good order.  (R. 120).  Dr. Peabody also wrote under "Impressions" in his treatment notes that Vailes' coronary artery disease, hyperlipidemia, and his hypertension were all under control.  (R. 120).

---

[12] "Atherosclerosis" is a common form of arteriosclerosis in which deposits of yellowish plaques containing cholesterol, lipoid material, and lipophages are formed within the intima and inner media of large and medium-sized arteries.  *See* DORLAND'S, *supra*, at 167.  "Arteriosclerosis" is a disease that is characterized by the thickening and loss of elasticity of arterial walls.  *See* DORLAND'S, *supra*, at 140.

[13] "Patency" is the condition of being widely open.  *See* DORLAND'S, *supra*, at 1335.

On May 15, 2002, Vailes met with William H. Couch, M.D. ("Dr. Couch"), who noted that everything appeared under control, and that Vailes was not experiencing chest pain or shortness of breath. (R. 170).

Vailes underwent another exercise/stress test on June 24, 2002, where it was noted that Vailes had very normal results. (R. 197). One day later, on June 25, 2002, Vailes had an appointment with Dr. Couch to discuss his recent back pains. (R. 169). Vailes explained to Dr. Couch that three days earlier he had thrown his back out while raking leaves and trash. (R. 169). Vailes stated that the pain was mostly in his hip area, and that he experienced right leg numbness at times when the pain seemed to be subsiding. (R. 169). Dr. Couch prescribed Celebrex[14] and Flexeril,[15] and instructed Vailes not to engage in any heavy lifting or excessive work for the next week. (R. 169).

A couple of days later, Vailes met with Raul Sanchez-Ramos, M.D. ("Dr. Sanchez-Ramos") at the Cypress Physicians Association because he was not convinced that Dr. Couch's diagnosis (*i.e.*, that the pain was muscular) was correct. (R. 138). Dr. Sanchez-Ramos prescribed Zanaflex,

---

[14]  "Celebrex" is a trademark for a preparation of celecoxib, which is a nonsteroid antiinflammatory drug that is used for the symptomatic treatment of osteoarthritis and rheumatoid arthritis. *See* DORLAND'S, *supra*, at 305.

[15]  "Flexeril" is a trademark for a preparation of cyclobenzaprine hydrochloride. *See* DORLAND'S, *supra*, at 685. "Cyclobenzaprine hydrochloride" is a compound that is used as a muscle relaxant. *See* DORLAND'S, *supra*, at 443.

Darvocet,[16] and Medrol,[17] and further ordered for a lumbar[18] spine series to be performed on Vailes. (R. 138-140).  On July 1, 2002, the lumbar spine series was performed at River Oaks Imaging and Diagnostics.  (R. 137).  It was determined that the lumbar spine series was essentially unremarkable. (R. 137).

On July 11, 2002, Vailes visited the North Houston Heart Center, where it was noted that there were no significant changes in Vailes' health.  (R. 193-194).  Vailes visited the North Houston Heart Center again on October 9, 2002, and again, there were no significant changes to his health. (R. 189-190).  On the same day, another stress test was performed, and it was returned as "normal." (R. 191).

On October 10, 2002, Vailes visited with Dr. Sanchez-Ramos complaining of headaches. (R. 135).  Dr. Sanchez-Ramos ordered that a CT scan be performed.  (R. 135).  On October 11, 2002, the CT scan showed that there was mild deviation of the right nasal septum, that the sinuses were clear, and that all bones appeared to be intact.  (R. 130).

On October 23, 2002, Vailes returned to the North Houston Heart Center, and it was noted that everything appeared to be the same.  (R. 187-188).  From this appointment until April, 2003, Vailes' medical records to not indicate any other appointments.  On April 23, 2003, it was again

---

[16] "Darvocet" is the trademark for preparations of propoxyphene napsylate and acetaminophen.  *See* DORLAND'S, *supra*, at 459.  "Acetaminophen" is a nonprescription drug having effects similar to aspirin. *See* DORLAND'S, *supra*, at 12.  "Propoxyphene napsylate" is an analgesic that is structurally related to methadone.  *See* DORLAND'S, *supra*, at 1469.

[17] "Medrol" is the trademark for preparations of methylprednisolone.  *See* DORLAND'S, *supra*, at 1072. "Methylprednisolone" is an anti-inflammatory and immunosuppressant in a wide variety of disorders.  *See* DORLAND'S, *supra*, at 1105.

[18] "Lumbar" pertains to the parts of the sides of the back between the thorax and the pelvis.  *See* DORLAND'S, *supra*, at 1029.

determined at the North Houston Heart Center that everything was stable.  (R. 184-185).  It was especially noted that Vailes had "excellent cholesterol numbers."  (R. 184).

On May 25, 2003, Vailes arrived at the Northeast Medical Center Hospital's Emergency Center.  (R. 142-150).  He reported that he had been experiencing right lower quadrant abdominal pain for several days.  (R. 142-143).  He was released the same day after seeing David C. Carlyle, M.D., who noted in "Clinical Impression" that Vailes' had ureterolithiasis,[19] and instructed Vailes to drink lots of fluids and return if his temperature exceeded 101 degrees Fahrenheit.  (R. 145, 148).

Vailes visited with Dr. Couch on July 9, 2003, where it was noted that he had gained 18 pounds in the last year.  (R. 167).  At that time, Vailes weighed 285 pounds.  (R. 167).  It was further noted that there was no evidence of any edema,[20] reflex loss, loss of sensation, or abnormalities of gait.  (R. 167).  However, other than those notations, nothing seemed to be significantly different from his last visit.  (167-168).  After this appointment, there are no other records for almost one year.

On April 7, 2004, Vailes visited Dr. Peabody for his annual check-up.  (R. 177-178).  Vailes stated that his "chest pain is the same but more frequent."  (R. 177).  Dr. Peabody noted that she was worried about Vailes' risk factor reduction, and that she recommended aggressive control of his diabetes.  (R. 178).  Dr. Peabody also noted that the claimant had normal muscle strength with no evidence of motor deficits or peripheral edema.  (R. 178).

---

[19] "Ureterolithiasis" is the formation of calculus in the ureter, which is the tube which conveys the urine from the kidney to the bladder.  *See* DORLAND'S, *supra*, at 1915.

[20] "Edema" is the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body. *See* DORLAND'S, *supra*, at 567.

On May 19, 2004, Vailes' echocardiogram report revealed that there was a dilated left atrium,[21] mild mitral regurgitation,[22] and mild tricuspid regurgitation.[23]  (R. 179).  Everything else was found to be normal.  (R. 179).

Vailes visited Dr. Couch on July 13, 2004, asserting that no one would hire him due to his heart problems.  (R. 162).  Because the echocardiogram showed 60% ejection, Vailes thought that his heart was only working at 60% of normal, which he had told to the lawyers he hired.  (R. 162).  Dr. Couch corrected Vailes by explaining to him that a 60% ejection fraction was not a bad ejection fraction.  (R. 162).  Dr. Couch further reported that Vailes was experiencing occasional bouts of angina[24] with exertion, but that this was easily relieved with Nitroglycerine.  (R. 162).

The last medical record is dated August 31, 2004, at which time Vailes went to see Dr. Peabody for a nuclear stress test.  (R. 176).  At this appointment, Dr. Peabody noted that Vailes' stress test returned normal.  (R. 176).

## 2.  *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a plaintiff alleges disability resulting from pain, he

---

[21] When used alone, "atrium" designates an atrium of the heart.  *See* DORLAND'S, *supra*, at 169.  Therefore, the claimant's left heart chamber was bigger than usual.

[22] "Mitral regurgitation"  is the backflow of blood from the left ventricle into the left atrium, owing to insufficiency of the mitral valve. It may be acute or chronic, and is usually due to mitral valve prolapse, rheumatic heart disease, or a complication of cardiac dilation.  *See* DORLAND'S, *supra*, at 1555.

[23] "Tricuspid regurgitation" is the backflow of blood from the right ventricle into the right atrium, owing to imperfect functioning of the tricuspid valve.  *See* DORLAND'S, *supra*, at 1555.

[24] "Angina" is any spasmodic, choking, or suffocative pain.  *See* DORLAND'S, *supra*, at 81.

must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally, the mere existence of pain does not automatically bring a finding of disability.  *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

19

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference. *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706. However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

Throughout the record, Vailes complained of numerous different kinds of pain. (R. 109, 124, 135, 142-143, 169, 177). The ALJ, however, determined that Vailes' subjective complaints regarding his pain and functional limitations were not totally credible. (R. 17). The ALJ's decision indicates that he considered objective and subjective indicators related to the severity of Vailes' pain:

> The claimant indicated in his written statements that he was experiencing pain in his chest and jaws which occurred on a daily basis, as well as back pain, and pain, swelling, and numbness in his legs.
>
> * * *
>
> Factors for consideration in evaluating an individual's subjective complaints of pain include whether there is documentation of persistent limitations of range of motion, muscle spasms, muscular atrophy from lack of use, significant neurological deficits, weight loss or impairment of general nutrition, and non-alleviation of symptoms by medication.
>
> * * *
>
> None of the claimant's examinations have disclosed any of the above findings to any significant degree. Moreover, in spite [of] the claimant's allegations, the record contains no evidence of any complaints of treatment for carpal tunnel syndrome, back pain, or swelling, pain, and numbness of his lower extremities at any time relevant to this decision.

(R. 15-16) (internal citations omitted).

20

The ALJ correctly noted that  the claimant had normal muscle strength throughout, with no evidence of any motor deficits or peripheral edema.  (R. 16, 178).  Also, Vailes had no evidence of reflex loss, loss of sensation, or abnormalities of gait, and a nuclear stress test and echocardiogram performed during the period under consideration were essentially normal.  (R. 16, 162, 167-168, 176, 178).  Vailes acknowledged that he was able to drive for short distances, walk for exercise, and perform housework and yard work.  (R. 102-103).

Based on a review of the entire record, the Court does not doubt that Vailes suffers from pain but, nonetheless, finds that the medical record does not support a finding that Vailes' pain is constant, unremitting, and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  Throughout his records, Vailes reported that he was "doing fairly well," that he had a "great deal of energy," "no chest pain or shortness of breath," and when he experienced abdominal pain during a visit to the ER, it was described as "mild."  (R. 122, 124, 142-143, 167, 170).

The ALJ is entitled to consider the credibility of the claimant and to weigh inconsistent evidence.  *See Chambliss*, 269 F.3d at 522; *Dunbar*, 330 F.3d at 672.  Accordingly, there is substantial evidence to support the ALJ's finding that Vailes' subjective reports of pain do not rise to the level of disability.  *See Ortiz v. Barnhart*, 70 Fed. Appx. 162, 164 (5th Cir. 2003); *Jones v. Barnhart*, 35 Fed. Appx. 390 (5th Cir. 2002).

### 3.     *Residual Functional Capacity*

Under the Act, a person is considered disabled:

. . . only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

> which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for [him], or whether he would be hired if he applied for work . . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow him to perform work in the national economy.  *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that he cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed.  *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  This term merely represents an individual's ability to perform activities despite the limitations imposed by an impairment.  *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work.  *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545.  When a claimant's residual functional capacity is not sufficient to permit him to continue his former work, then his age, education, and work experience must be considered in evaluating whether he is capable of performing any other work.  *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520.

Moreover, under certain circumstances, the ALJ's application of the medical-vocational guidelines set forth in Appendix 2 of Subpart P of the Regulations – also referred to as the grids – without testimony from a vocational expert, is sufficient to assess whether a claimant is able to work or is disabled under the Act. *See Heckler v. Campbell*, 461 U.S. 458, 467, 470 (1983). As the Supreme Court explained in *Campbell*:

> These guidelines relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy. They consist of a matrix of the four factors identified by Congress— physical ability, age, education, and work experience – and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

*Id*. at 461-62 (footnotes omitted). The Court elaborated:

> Each of these four factors is divided into defined categories. A person's ability to perform physical tasks, for example, is categorized according to the physical exertion requirements necessary to perform varying classes of jobs – *i.e.*, whether a claimant can perform sedentary, light, medium, heavy, or very heavy work. Each of these work categories is defined in terms of the physical demands it places on a worker, such as the weight of objects he must lift and whether extensive movement or use of arm and leg controls is required.

*Id.* at 462 n.3 (citations omitted).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The SSRs are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id*. In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id*. In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that a claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis. *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

When a claimant suffers only exertional impairments and an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with the grids, the Commissioner may rely exclusively on the medical-vocational guidelines to determine whether work exists in the national economy which the claimant can perform.  *See Newton*, 209 F.3d at 458 (citing *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987); 20 C.F.R. § 404.1569(b)).  Nevertheless, use of the grid rules is appropriate only when it is established that the claimant suffers only from exertional impairments, or that the claimant's nonexertional impairments do not significantly affect his or his residual functional capacity.  *See Crowley*, 197 F.3d at 199; *accord Watson*, 288 F.3d at 216; *Loza v. Apfel*, 219 F.3d 378, 398 (5th Cir. 2000); *Newton*, 209 F.3d at 458.  If the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that suitable jobs exist in the economy.  *See id.*  Therefore, before applying the grids, it must be determined whether nonexertional factors, such as mental illness, significantly affect a claimant's RFC.  *See Loza*, 219 F.3d at 399; *Newton*, 209 F.3d at 459.

In the case at bar, Vailes' alleged impairments produce a degree of limitations in his ability to function in a work setting; however, the ALJ did not believe his impairments were as "severe" as Vailes alleged.  (R. 16).  As discussed above, the ALJ found that Vailes did not complain about certain alleged impairments, that he had normal muscle strength, and that all of his stress tests were found to be normal.  (R. 16, 117, 162, 167-168, 176, 178, 191, 197).

The ALJ made the following findings regarding Vailes' functional limitations:

 . . . during the period from the alleged onset date of October 19, 2003, to March 28, 2005, the claimant retained the residual functional capacity to perform medium work.

25

* * *

The term "medium work" means a job which involves lifting up to 50 pounds occasionally and 25 pounds frequently. The ability to do medium work also assumes the ability to do light and sedentary work (20 CFR § 404.1657(c)).

(R. 16).

Notwithstanding the ALJ's RFC finding that Vailes could perform work of medium exertion level, the jobs that the ALJ found that Vailes could return to were his past relevant work as an assistant jail administrator and booking desk supervisor, which are both considered light work. (R. 18). Vailes described the above two jobs as requiring walking and/or standing for eight hours and lifting objects that weigh less than ten pounds. (R. 64, 65). More importantly, Vailes concedes that he can perform lift work. *See* Docket Entry No. 14, at 7. If the ALJ finds that a claimant can do medium work, he can also do light and sedentary work. *See* 20 C.F.R. § 404.1567(c).

Vailes contends that the ALJ failed to properly evaluate the treating physicians' opinions using the factors set forth in 20 C.F.R. § 1527(d). *See* Docket Entry No. 14, at 6. Vailes, however, failed to identify any specific opinion in the record that the ALJ rejected. Because the ALJ did not reject a physician's opinion, the ALJ was not required to evaluate a treating physician's opinion under 20 C.F.R. § 1527(d).

Vailes also contends that the ALJ erred in failing to recontact Drs. Peabody, Couch, or Lachterman for clarification or for additional evidence regarding his limitations. *See* Docket Entry No. 14, at 6. A treating physician only need be recontacted when "the evidence we receive . . . is inadequate for us to determine whether you are disabled . . . ." *See* 20 C.F.R. § 404.1512(e). As noted above, Vailes failed to cite to any specific physician's opinion that was not followed. The

record contained sufficient information for the ALJ to make an informed decision whether Vailes was disabled from October 19, 2003, through March 28, 2005. (R. 106-128, 161-197). Thus, the duty to recontact a treating physician was not triggered.

In sum, none of the jobs identified by the ALJ that Vailes could perform required heavy lifting. Taking into consideration the record evidence as a whole, the RFC determination sufficiently compensated for Vailes' limitations. Consequently, the ALJ correctly determined that the identified jobs were within Vailes' physical residual capacity, and constituted "substantial gainful work" as required by 42 U.S.C. § 423(d)(2)(A).

## III.     *Conclusion*

In sum, the record does provide substantial evidence supporting the Commissioner's decision that Vailes is not disabled. Accordingly, it is therefore

**ORDERED** that Plaintiff Harold B. Vailes' Motion for Summary Judgment (Docket Entry No. 14) is **DENIED**. It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED**.

**SIGNED** at Houston, Texas on this 10th day of March, 2008.

Calvin Botley
United States Magistrate Judge